## JOHNSON v. UNITED STATES.

### No. 4271.

Circuit Court of Appeals, Fourth Circuit.

April 5, 1938.

John H. Meek, of Huntington, W. Va. (J. B. Meek, of Huntington, W. Va., on the brief), for appellant.

Dan M. Jackson, Sp. Asst. to Atty. Gen., and William J. Connor, Sp. Atty., Department of Justice of Washington, D. C. (George I. Neal, U. S. Atty., of Huntington, W. Va., on the brief), for the United States.

Before PARKER, NORTHCOTT, and SOPER, Circuit Judges.

SOPER, Circuit Judge. ·

The defendant in the District Court was found guilty upon the first count and not guilty upon the remaining five counts of an indictment wherein he was charged with willful misapplication of moneys of the Point Pleasant National Bank in Point Pleasant, W. Va., a member of the Federal Reserve System, while occupying the position of president and director of the bank, in violation of section 592 of title 12 U.S.C.A. He assigns as error the overruling of a demurrer to count 1 of the indictment and also certain rulings of the court upon the sufficiency of the evidence to support the verdict, upon objections to certain testimony offered by the United States, and upon certain requests for instructions to the jury.

The sufficiency of the first count. of the indictment was challenged by a demurrer and by motion in arrest of judgment and the question raised is of importance in the case. It was charged in substance that the defendant was president and director of the bank, and, while acting as such, did unlawfully, willfully, knowingly, fraudulently, and feloniously, without the knowledge or consent of the bank, and with intent to injure and defraud it, misapply its moneys and funds to the amount of $600 and convert them to his own use with intent to permanently deprive the bank of the money. The means whereby this misapplication was effected was described in the following terms: "That said wilful misapplication was consummated by the said defendant, Howard S. Johnson, on September 30, 1935, crediting to his personal checking account in the said banking association and member bank, the sum of Six Hundred Dollars ($600.00), which said sum was the proceeds of a note of one Floyd Stover discounted at said banking association and member bank, and the said note was carried in cash items from September 30, 1935, until December 31, 1935, which was not approved by the Board of Directors, and has not been approved by said Board of Directors up to May 1, 1936, said funds and moneys being then and there used and misapplied by the defendant, Howard S. Johnson, to eliminate an overdraft that the said defendant had made in his personal checking account, said crediting to his said personal checking account of the said sum of Six Hun-

dred Dollars ($600.00) said defendant then and there well knew was a misapplication of said sum of money and that said promissory note being the individual obligation of Floyd Stover and not the obligation of Howard S. Johnson, President as aforesaid; contrary to the form of the statute, section 592, Title 12 of the United States Code Annotated and against the peace and dignity of the United States."

Upon an examination of this language, certain questions at once arise in the reader's mind. (a) By whom and by what authority was the note discounted? It is charged only that it was "discounted at said banking association and member bank." The statute, 12 U.S.C.A. § 24(7), provides that a national banking association shall have power "to exercise by its board of directors or duly authorized officers or agents, subject to law, all such incidental powers as shall be necessary to carry on the business of banking; by discounting and negotiating promissory notes." The indictment does not state who exercised the power on this occasion. It does not even show with certainty that the note was not discounted by the board itself; for although it is clear that something was done "which was not approved by the Board of Directors," we cannot be sure that this clause applies to the crediting of $600 to the defendant's account, and to the discount of the note, and to the carrying of the note as a cash item, or only to the last of these actions. We may fairly conclude from the punctuation that it was only the last action that the board did not approve. The point, however, is unimportant, for there is nothing to show that the president or some other official of the bank did not have authority to discount paper or that the authority was not properly exercised by the proper persons with regard to the Stover note.

(b) Who caused the note to be carried as a cash item and why was it so carried? It is merely alleged that the note was carried as a cash item from September 30, 1935, when the money was credited to the defendant's account, until December 31, 1935, but it is not shown that this was done by the defendant or upon his orders or with his knowledge. Nor is it charged that the note was carried as a cash item for purposes of concealment or for any other improper purpose.

(c) Passing from these queries, we do not find a certain answer to the question whether the maker of the note was solvent when it was discounted, so as to justify the belief on the part of the agent of the bank who discounted it that it would be paid on maturity. On this point the indictment is silent, and hence it may fairly be inferred that the note was discounted in good faith in the usual course of business; and if this was true, and if the authority to discount notes had been delegated to officials of the bank, it was of no moment that at the time the transaction took place it had not received the approval of the board.

(d) It is said that the note was the individual obligation of Stover and not the obligation of the defendant; and we take this statement to mean that Stover and not the defendant was the maker of the note. But we are not told who was the payee of the note; and it may be that Stover gave the note in payment of a personal obligation due the defendant, who, in turn, had it discounted at the bank. This inference is entirely consistent with the allegations of the indictment.

(e) Did the defendant subsequently withdraw from the bank any part of the proceeds of the note which he caused to be credited to his account? The allegations of the indictment are silent on this point and so it may be that nothing of value was taken from the bank as a result of the transaction.

When we answer these queries in the manner most favorable to the defendant, as we are obliged to do under the established rule of criminal pleading, Fontana v. U. S., 8 Cir., 262 F. 283; United States v. Morse, D.C., 287 F. 906; Asgill v. United States, 4 Cir., 60 F.2d 780, we find that it is consistent with the indictment to say that the Stover note was discounted in good faith by a duly authorized agent of the bank; that Stover was solvent and the bank officials expected it to be paid upon maturity; that the note was payable to the defendant so that it was lawful and proper for him to make use of the proceeds; that they were credited upon an overdraft which had been lawfully made, and that subsequently the defendant made no improper withdrawals of money from the bank. Obviously such a statement imports no criminality on the part of the defendant; but it cannot be disregarded for this part of the count is essential to the validity of the indictment. The Supreme Court pointed out in United States v. Britton, 107 U.S. 655, 669, 2

S.Ct. 512, 27 L.Ed. 520, that the words "willfully misapplied" in the statute have no settled technical meaning and do not of themselves fully and clearly set forth every element of the offense charged; and hence it is not sufficient simply to aver that the defendant ·willfully misapplied the funds of the bank, but there must be additional averments to show how the misapplication took place and that it was unlawful.

We do not mean to suggest that all of the inferences favorable to the defendant outlined above are necessary to establish the invalidity of the indictment. It is settled by the decisions of the courts that the misapplication condemned by the statute is something more than an irregular or improper use of the bank's funds. Fraud must be found and some conversion of the funds of the bank to the use or gain of the person charged or of some person other than the bank. It is very clear that if Stover was financially able to pay the amount of the discounted note and it was discounted at the bank in that belief, with or without the approval of the board, and the note or the proceeds of the discount came into the hands of the defendant lawfully and with the consent of Stover, no fraud was involved in crediting the proceeds to the defendant's account. Moreover, even if the maker of the note was not able to pay it at the time it was executed, the transaction was not necessarily criminal. In Evans v. United States, 153 U.S. 584, 592, 14 S.Ct. 934, 938, 38 L.Ed. 830, the Supreme Court said: "While the mere discount of an unsecured note, even if the maker and the officer making the discount knew it was not secured, would not necessarily be a crime, if the maker believed that he would be able to provide for it at maturity, yet if his original intent was to procure the note to be discounted in order to defraud the bank, as charged in this count, every element of criminality is present. The case is not unlike that of purchasing goods or obtaining credit. If a person buy goods on credit, in good faith, knowing that he is unable to pay for them at the time, but believing that he will be able to pay for them at the maturity of the bill, he is guilty of no offence, even if he be disappointed in making such payment. But if he purchases them, knowing that he will not be able to pay for them, and with an intent to cheat the vendor, this is a plain fraud, and made punishable as such, by statutes, in many of the states. In this particular of an intent to defraud, the case is distinguishable from that of United States v. Britton, 108 U.S. 193, 2 S.Ct. 526 [27 L.Ed. 701]; in which the charge was that the defendant, being president and director of the association, and being insolvent, procured his own note to be discounted, the same not being well secured, the payee and the indorser thereof being also insolvent, which he, defendant, well knew. The incriminating facts were that the note was not well secured, and that both the maker and indorser were, to the knowledge of the defendant, insolvent when the note was discounted. The question there presented was whether the procuring of the discount of such a note by an officer of the association was a willful misapplication of its moneys within the meaning of the law. It was held that it was not. The criminality really depends upon the question whether there was at the time of the discount a deliberate purpose on the part of the defendant to defraud the bank of the amount."

Furthermore, even if the parties did not believe in good faith that the note would be paid at maturity, there would be no misapplication within the statute under the decisions unless there was some conversion of the bank's funds. Thus in Batchelor ·v. United States, 156 U.S. 426, 15 S.Ct. 446, 39 L.Ed. 478, an indictment was found defective which charged that the president of a bank discounted and made loans on promissory notes executed by another and indorsed by himself, both being insolvent, and used the proceeds to satisfy and take up his own indebtedness to the bank, because it was not shown that any moneys were paid by the bank or by any one else for the notes discounted; and in Cooper v. United States, 4 Cir., 13 F.2d 16, it was held by this court that the offence of misapplication was not committed when the president of a bank discounted for his brother the accommodation note of an insolvent person, and caused the proceeds to be credited upon the brother's indebtedness to the bank, unless some part of the moneys credited were withdrawn. See, also, Robinson v. United States, 6 Cir., 30 F.2d 25; McCallum v. United States, 8 Cir., 247 F. 27, 31, 33. Compare Rieger v. United States, 8 Cir., 107 F. 916; United States v. Youtsey, C.C., 91 F. 864.

■ The government's case is not strengthened by the mere fact that the proceeds of the Stover note were credited against the defendant's overdraft. An overdraft is not necessarily fraudulent and we may not assume that it was improper or unlawful in this case, as we are not told the circumstances under which it occurred. We know only that it existed and was offset by the credit; but this of itself, it has been frequently held, is not a crime unless some portion of the fund credited is withdrawn from the possession or control of the bank or a conversion thereof in some form is made so that the bank is deprived of the benefit thereof. Dow v. United States, 8 Cir., 82 F. 904; Adler v. United States, 5 Cir., 182 F. 464; Craig v. United States, 9 Cir., 5 F.2d 275. It must be borne in mind that it is not charged that the money credited to the defendant's account was subsequently withdrawn. So far as we know from the indictment none of it ever left the bank.

■ We reach the conclusion that the demurrer to the indictment should have been sustained; for even though we bear in mind that in modern practice formal defects in criminal pleading, not prejudicial, will be disregarded, Hagner v. United States, 285 U.S. 427, 52 S.Ct. 417, 76 L.Ed. 861, it is manifest that count 1 does not contain the elements of a criminal misapplication under the statute and does not sufficiently apprise the defendant of what he must be prepared to meet. The pertinence of this examination of the indictment is strikingly emphasized by the indefiniteness of the evidence offered during the trial. The defendant and one Robert L. Hogg jointly owned certain real estate in Point Pleasant, which they sold to Stover in the latter part of August, 1935, for $1,200. In payment therefor Stover gave two notes for $600, each dated August 21, 1935, one payable to Hogg and one to the defendant one year after date, with interest at 6 per cent. Hogg sent a deed to the defendant to be executed conveying the property to Stover. A few days later the defendant received his note for $600, and still later the executed deed was sent to Stover. Upon receiving it Stover made an examination and according to his testimony came to the conclusion that the deed covered less property than he had bought. On the next day he informed the defendant that he would not accept the deed. He did not, however,

return it and finally lost it in January, 1937. He did not record it or take possession of the property. It is not made clear in Stover's testimony whether he repudiated the sale before or after the defendant discounted his note on September 30, 1935. The defendant on his part testified that Stover's objection was not communicated to him until after he had discounted the note and had asked Stover to substitute for it a four months' note.

The testimony as to Stover's financial condition on September 30th is also indefinite. The defendant testified that he considered the note good because Stover had the deed to the property. On one or more previous occasions the bank had loaned Stover an insignificant sum of money on his unsecured note. The national bank examiner ordered the note of $600 charged off as worthless on October 9, 1936.

The note first made its appearance on the records of the bank as a cash item on September 30, 1935, and thus remained until December 31, 1935, the amount of $600 being carried either as a check drawn on another bank in Point Pleasant or under the name of Floyd Stover in the cash item list. On December 31, 1935, the note was transferred to the note ledger. The defendant testified that he discounted the note on behalf of the bank on September 30, 1935; that he carried it as a cash item because it was a twelve months' note and he wanted to have it changed to a note for four months, the longest period for which notes were usually discounted by the bank; that, after he found that Stover would not change the note, it was put on the discount register; and that occasionally notes were held as cash items for a while in order to eliminate bookkeeping work.

The evidence did not show that the defendant did not have authority to discount notes. Meetings of the board were held monthly. The chief evidence as to the board's knowledge of the Stover note was that of the defendant. He testified without contradiction that, when the note was first presented to the board, an objection was raised as to its period but it was not rejected; that he told the board of Stover's objection to the deed at the first meeting after it was made but the board took no action until March 3, 1936, when its minutes show that the board ap-

proved the notes presented with the exception of the Stover note. The assistant cashier, testifying for the United States, said that the directors knew that the note was being carried as a cash item. A few days before the trial the note was purchased from the bank through a representative of the defendant with money provided by his wife.

The evidence throws no light upon the defendant's overdraft except to show that on September 30, 1935, it amounted to $760.76. Deposits on this day, including the $600 Stover item, offset the overdrafts and produced a credit balance of $110.74. Subsequently the defendant continued to use the account for deposits and withdrawals until the 31st day of October, 1935, when the balance was $8.75.

 Upon this testimony the judge charged the jury that if they should find beyond a reasonable doubt that the defendant on September 30, 1935, with intent to injure and defraud the bank, discounted the Stover note for $600 without the approval of the board of directors, and charged the note to cash items and credited his personal checking account with the proceeds of the note to cover an existing overdraft in his account, they should convict the defendant.

The government endeavors to support this charge upon the theory that the jury was justified in finding from the evidence that the defendant knew when he discounted the note that Stover was a man of no financial responsibility, and also that Stover had repudiated the purchase of the defendant's land; and that despite this knowledge, the defendant discounted the note, carried it as a cash item for purposes of concealment and converted the proceeds to his own use by crediting the overdraft to his personal account. This argument, even if it be sound, does not justify the judge's charge. It was not left to the jury to find from the evidence whether or not the defendant had knowledge of Stover's financial weakness or of the infirmity of the note. The evidence on these points, stated most favorably to the government, presented a question for the jury, while the charge of the court instructed them in general terms that they should find a verdict of guilty if, with intent to defraud the bank, the note was discounted without the approval of the board and the proceeds credited to the defendant's account. The general refer-

ence in the charge to fraudulent intent was not sufficient to apprise the jury of their responsibility. They should have been instructed to find whether or not those facts existed upon which the charge of fraud was necessarily based.

In addition, the charge assumes that the crediting of the proceeds of the note to the defendant's account constituted a conversion of the funds of the bank punishable as a misapplication under the statute. The decisions are to the contrary, as we have shown. The indictment is not based upon the withdrawals of money prior to September 30, 1935, whereby the overdraft was credited; nor upon the withdrawals of money by the defendant after that date; and hence, even if it be assumed that some infraction of the statute was involved therein, the defendant cannot be found guilty in this case.

Reversed.