UNITED STATES, Appellee,

v.

Nunziato FUSARO, Defendant,
Appellant.

UNITED STATES, Appellee,

v.

Richard R. SACCONE, Defendant,
Appellant.

UNITED STATES, Appellee,

v.

Richard E. ROBIDOUX, Defendant,
Appellant.

Nos. 82–1024, 82–1025 and 82–1060.

United States Court of Appeals,
First Circuit.

Argued Sept. 9, 1982.

Decided May 26, 1983.

Frederick S. Pillsbury, Springfield, Mass., with whom Doherty, Wallace, Pillsbury & Murphy, Springfield, Mass., was on brief, for defendant, appellant Nunziato Fusaro.

Stephen W. Silverman, Springfield, Mass., by appointment of the Court, for defendant, appellant Richard R. Saccone.

Harry C. Mezer, Boston, Mass., for defendant, appellant Richard E. Robidoux.

George F. Kelly, Sp. Asst. U.S. Atty., Springfield, Mass., with whom William F. Weld, U.S. Atty., Boston, Mass., was on brief, for appellee.

Before COFFIN, Chief Judge, SWYGERT,* Senior Circuit Judge and BREYER, Circuit Judge.

SWYGERT, Senior Circuit Judge.

These three consolidated appeals arise from the convictions of Nunziato Fusaro, a prominent Worcester attorney, Richard Saccone, president of Mohawk Trust and Savings Bank of Greenfield, Massachusetts ("Mohawk"), and Richard Robidoux, a businessman, on federal charges relating to a scheme that defrauded Mohawk, a small federally-insured bank. After a twenty-day trial including the testimony of more than fifty witnesses, these three men were convicted of misapplication of bank funds, 18 U.S.C. § 656 (1976), unauthorized issuance of checks, *id.* § 1005, false entries in bank books, *id.* § 1005, false statements on promissory notes, *id.* § 1014, and conspiracy to commit these offenses and to defraud the Federal Deposit Insurance Corporation ("FDIC"), *id.* § 371. We affirm.

The defendants raise numerous objections, and brevity will be served by joint treatment of their common objections. Following the presentation of the facts in Part I, we consider Fusaro's and Saccone's objections to the sufficiency of the evidence in Part II. Part III discusses Fusaro's and Saccone's objections to the jury instructions. In Parts IV and V, we treat, respectively, Fusaro's and Robidoux's remaining objections.

I

It is unnecessary to recount the voluminous evidence presented and we report here only the gist and some of the highlights of the case. In October 1979 Robidoux, a ten-year client of Fusaro, was in financial trouble. The principal lender to United Chevrolet ("United"), a General Motors dealership owned by Robidoux, denied further credit to United and demanded repayment of existing loans. United owed General Motors Acceptance Corporation approximately $825,000, and Robidoux owed Fusaro substantial sums for legal services. Robidoux had other debts, clamoring creditors, and other assets.

Saccone became president of Mohawk in August 1978. Shortly thereafter, an attorney employed by Fusaro became Mohawk's legal counsel. Mohawk is a small bank, capitalized at $300,000, and pursuant to

* Of the Seventh Circuit, sitting by designation.

Mass.Gen.L. ch. 172, § 54(A), subs. (b), Mohawk's lending limit to any one person was $60,000. Saccone was authorized to grant secured and unsecured loans of $10,000 prior to approval of Mohawk's Executive Committee.

The financial bleeding of Mohawk took place on several fronts. First, without prior approval of Mohawk's Executive Committee, Saccone authorized a $50,000 unsecured loan to Robidoux and a $50,000 secured loan to United. Mohawk had had no prior dealings with Robidoux or United, and no credit checks were performed. After the loans were authorized, Fusaro furnished the supporting credit information which omitted substantial liabilities of Robidoux. Of this initial $100,000, Fusaro kept half, crediting the funds to Robidoux's debts to Fusaro.

Second, in a two-week period Saccone authorized thirteen loans, without prior Executive Committee approval and without credit checks, to individuals who did not know they were becoming indebted to Mohawk. Some of these individuals had consented to help Robidoux obtain loans from Mohawk, but they had not consented to become debtors of Mohawk. The supporting financial information, some of which was materially false, was prepared in large part by Fusaro, although Robidoux, without authorization, signed the names of these borrowers to the documents. These loans, totalling some $620,000, went to Fusaro's or Robidoux's benefit. When the loans became due, the debt was extended, without prior approval by Mohawk's Executive Committee, by a virtually worthless third mortgage on some of Robidoux's assets, and with secured notes from friends of Robidoux who were told that Robidoux would be responsible for repayment. The evidence indicates Saccone was aware of these assurances.

Third, as a financial basis for Mohawk's increased lending activity, Fusaro and Robidoux arranged for the temporary opening of fourteen accounts and $400,000 in fund transfers to Mohawk. The evidence indicates Saccone knew these were temporary fund transfers. One such account was opened in Fusaro's law office. Most of these funds were withdrawn a few weeks after they were deposited.

Fourth, as the house of cards began to fall, other desperate steps were taken. Fusaro arranged for the transfer of Robidoux's house to Fusaro's sister-in-law. Fusaro arranged to buy out Mohawk's $50,000 loan to Robidoux through a deal involving the assignment of the note to Fusaro's sister-in-law, using a check from Fusaro's nephew. Other actions were taken which need not be recounted. Mohawk's records are neither accurate nor complete. The entire episode lasted only a few months, from November 2, 1979, to February 15, 1980, when Mohawk was closed and the FDIC liquidator took over. Robidoux and United filed for bankruptcy a month later.

All three defendants testified. Robidoux claimed he signed the names because his lawyer, Fusaro, told him to do so. Saccone claimed that he was duped by Fusaro, who, in Saccone's view, was Mohawk's lawyer. Fusaro claimed he knew nothing about the fraud, and, when he found out, he took steps to ensure that Robidoux paid back the money.

II

Fusaro's and Saccone's challenge to the sufficiency of the evidence focuses primarily on evidence concerning knowledge and intent. Viewing the evidence as a whole, with all reasonable inferences drawn in a light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Patterson,* 644 F.2d 890, 893 (1st Cir.1981), we find no merit in either defendant's objection.[1]

Both defendants rely upon *United States v. Gens,* 493 F.2d 216, 221–23 (1st Cir.1974).

---

1. Fusaro argues that our review of the evidence should be limited to the government's case-in-chief and Fusaro's defense. Fusaro cites no precedent for this unusual rule, and we see no reason to adopt it.

It is clear, however, from *Gens* that the *sine qua non* of charges of willful misapplication of bank funds is action taken with the knowledge of harm to, intent to harm, or reckless disregard for, the financial health of the bank. In *Gens* no such showing was made. Here, however, it is a fair inference that the loans at issue were made, at the very least, with a conscious disregard of a substantial and unjustifiable risk of injuring Mohawk. The crimes here, after all, concerned over $600,000 in loans for the benefit of one uninvestigated debtor by a very small bank.

■ Saccone's undisputed lies about the loans to various examiners, bank officials, bank employees, and debtors, as well as his failure to comply with Mohawk policies and state regulations create a more than substantial basis for the inference that he acted with the requisite knowledge and intent. It is no answer, as Saccone asserts, that he lacked motive because he was not financially enriched by the scheme. Motive is not synonymous with intent.

■ Fusaro's active participation in so many aspects of the scheme as well as his attempts to cover up the scheme as it unravelled, likewise, provides the basis for the inference that he acted with the requisite intent and knowledge. As to the fraudulent bank record entries, Fusaro's lack of knowledge of the specific entries is no defense. Once Fusaro's membership in the conspiracy is established, he is legally responsible for his co-conspirators' steps taken in furtherance of the objects of the scheme. *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1964).

■ Saccone asserts that the evidence was insufficient to prove him guilty of conspiracy because he met Robidoux only once, well after the initiation of the scheme, and did not know Fusaro well. The short answer to this claim is that a party to a conspiracy need not even know the identity of his co-conspirators. *United States v. Middlebrooks,* 618 F.2d 273, 278, *modified on other grounds,* 624 F.2d 36, 37 (5th Cir. 1980) (per curiam). The long answer is that

it is undisputed that Saccone knew Fusaro and knew who Robidoux was and knew Robidoux was the true beneficiary of the loans Saccone authorized.

Saccone's assertion that the evidence was insufficient because the government failed to prove Mohawk was a federally-insured bank is, likewise, meritless. Saccone conceded the issue in his opening remarks, and two FDIC employees' and a State Banking Commissioner's testimony all indicated the bank was federally insured. Our review of the record indicates that Mohawk's status as a federally-insured bank could be easily inferred from this testimony. This case is unlike *United States v. Bliss,* 642 F.2d 390 (10th Cir.1981), in which the trial judge set aside guilty verdicts on the ground that there was no evidence the bank was a member of the Federal Reserve, and the appellate court agreed that the bank's status was not inferentially established. *Id.* at 391.

### III

We turn next to Saccone's and Fusaro's objections concerning jury instructions. The underlying facts are not clearly presented by the parties. The trial judge requested submission of proposed jury instructions prior to the commencement of trial on October 19, 1981. On November 12 the government submitted a lengthy memorandum in support of its proposed jury instructions. On November 16 Fusaro and Saccone submitted a brief set of jury instructions but they did not submit any memorandum discussing the merits of conflicting proposals. At the close of the evidence on November 24 the trial court and the parties discussed the proposed jury instructions, and the court indicated the general direction it would take. On the morning of final arguments, November 30, Saccone and Fusaro submitted second proposals, again without any discussion of the merits of conflicting proposals, and a request, pursuant to Fed.R.Crim.P. 30, to be informed of the court's jury instructions prior to argument. The court stated that it would not take the time to "go through . . . again" its previous discussion of jury in-

structions. At closing argument Fusaro stressed the importance of finding specific intent to harm or defraud the bank, and Saccone stressed the importance of his defense of reasonable reliance on his attorney's advice. After the court gave the charge to the jury, but before it excused the jury, the court asked counsel if there were any objections. Neither counsel objected to the instructions argued here as objectionable.

■ Fusaro and Saccone claim that the district court violated Fed.R.Crim.P. 30 and, by omitting the instructions objected to here, severely prejudiced their defenses. In *Hamling v. United States,* 418 U.S. 87, 134–35, 94 S.Ct. 2887, 2916, 41 L.Ed.2d 590 (1974), the Supreme Court indicated that a mechanical approach to rule 30 is inconsistent with the rule itself as well as with Fed.R.Crim.P. 52(a). We think the November 24 bench conference satisfied the requirements of rule 30. The rule's object, to fairly inform the trial lawyers so that they may intelligently argue to the jury, *United States v. Clay,* 495 F.2d 700, 707 (7th Cir.), *cert. denied,* 419 U.S. 937, 95 S.Ct. 207, 42 L.Ed.2d 164 (1974), was satisfied by the court's general indications. *Id.* at 708. *See also United States v. Newson,* 531 F.2d 979, 982–83 (10th Cir.1976). While there can be no question that a full and explicit discussion of jury instructions is preferred, defense counsel, through their own lack of diligence, forced the trial court to handle the instructions during the press of trial and without the advantage of fully presented arguments. The court indicated that it would give a specific intent instruction concerning the 18 U.S.C. § 1005 counts and an instruction concerning Robidoux's defense of reliance on his lawyer's advice. The court did give such instructions, as discussed below, although not in the precise form requested. We agree with the Tenth Circuit in *Newson, supra,* that "the trial court is not bound to give instructions in the form and language requested, and that if the instructions as given are correct and cover the issues of the case, the judgment will not be disturbed." 531 F.2d at 983.

■ Fusaro and Saccone, moreover, did not even object at trial, when the alleged errors could easily have been corrected. They must establish, therefore, that the jury instructions were plainly erroneous. *United States v. St. Germain,* 680 F.2d 874, 877 (1st Cir.1980). Taking the instructions as a whole, there was no plain error.

The format of the instructions was a very detailed and indisputably complete recitation of the law, particularly the definition of intent and knowledge, followed by a brief restatement of the remaining charges with explicit cross-reference by the trial court to the earlier, fuller definitions. By singling out only this latter portion of the charge, Fusaro ignores the cross-reference format and the rule that we review the jury instructions as a whole.

Saccone's complaint that the placement of the charge concerning his defense was faulty is based on the same distortion of the form of the jury instructions. The instruction did not refer to certain counts, but explicitly was directed to the issue of intent in all the counts in which intent was an issue. When viewed as a whole the court's presentation of the issue enabled the jury to understand its importance.

■ Fusaro claims plain error in the charge that "[y]ou *may* consider any evidence that Fusaro was unaware of the circumstances surrounding the loans" because the jury should have been instructed that it *must* consider such evidence. We do not find any basis for holding that this semantic distinction constitutes plain error. The jury was well aware that Fusaro's knowledge was crucial to its determination of his guilt or innocence.

■ Saccone complains that the instruction concerning his defense of reasonable reliance upon his lawyer's advice was too brief and alluded to too quickly. Saccone cannot and does not argue, however, that the instruction failed to communicate to the jury the substance of his defense. *See United States v. Coast of Maine Lobster, Inc.,* 557 F.2d 905, 909 (1st Cir.), *cert. denied,* 434 U.S. 862, 98 S.Ct. 191, 54 L.Ed.2d

136 (1977). We find no plain error in the instruction.

## IV

We now consider Fusaro's remaining objections. First, Fusaro objects to the sufficiency of the indictment. Fusaro argues that because intent to injure or defraud the bank is an implied element of 18 U.S.C. § 1005 (1976) ("section 1005"), and because the relevant counts of the indictment do not include intent, these counts fail to state a federal offense. He also argues that Count 1, paragraph 3, charging conspiracy to violate 18 U.S.C. § 656, is insufficient because it does not include an intent charge.

This circuit has not decided whether specific intent is an implied element of section 1005, and the circuits are split on this issue. *Compare Harrison v. United States*, 279 F.2d 19, 23 (5th Cir.), *cert. denied*, 364 U.S. 864, 81 S.Ct. 105, 5 L.Ed.2d 86 (1960) (specific intent is not an element), *with United States v. Pollack*, 503 F.2d 87, 91 (9th Cir. 1974) (specific intent is an element).

 Fusaro's objection to the indictment affords us no opportunity to decide the section 1005 intent issue. When the crime is defined by statute without reference to intent, the indictment need not allege it. *See United States v. Behrman*, 258 U.S. 280, 288, 42 S.Ct. 303, 304, 66 L.Ed. 619 (1922); *Pino v. United States*, 370 F.2d 247, 249 (D.C.Cir.) (per curiam), *cert. denied*, 387 U.S. 922, 87 S.Ct. 2038, 18 L.Ed.2d 977 (1967). The indictment is sufficient if the offense is described with sufficient clarity to show a violation of law, and enables the accused to know the nature and cause of the accusation against him and to plead an acquittal or conviction in bar of future prosecution for the same offense. *Hamling v. United States*, 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974). The relevant counts track with specificity the statutory language and satisfy the *Hamling* test.

 Fusaro, moreover, was not prejudiced by the failure to allege intent in the relevant counts. The trial court here instructed the jury that in order to find a violation of section 1005, it must find an intent to injure or defraud. Fusaro's objection to the indictment is subject to the harmless error provision of Fed.R.Crim.P. 52(a). *United States v. Morrison*, 531 F.2d 1089, 1094 (1st Cir.), *cert. denied*, 429 U.S. 837, 97 S.Ct. 104, 50 L.Ed.2d 103 (1976); *United States v. Van West*, 455 F.2d 958, 959 (1st Cir.1973) (per curiam).

 Fusaro's objection to Count 1, paragraph 3, is equally without merit. The essence of the objection is that this conspiracy count did not define with precision the underlying substantive violations, delineated with unobjectionable specificity in those counts charging Fusaro directly with the substantive offense. The law is clear that a conspiracy count need not describe the substantive crime with the same degree of particularity as the count charging the substantive offense itself. *Rivera v. United States*, 57 F.2d 816, 819 (1st Cir.1932). *See also Williamson v. United States*, 207 U.S. 425, 447, 28 S.Ct. 163, 170, 52 L.Ed. 278 (1908). Because the conspiracy count tracked the language of the conspiracy statute, 18 U.S.C. § 371 (1976), it satisfied *Hamling, supra*, 418 U.S. at 117, 94 S.Ct. at 2907.

 Fusaro next objects to the district court's disposition of his motion for judgment of acquittal at the close of the government's case-in-chief. At bottom, this objection concerns what evidence may properly be considered either by the trial court or the appellate court. Because Fusaro presented evidence in his defense, the law is clear in this circuit that he has waived his objections concerning this motion. *See United States v. Kilcullen*, 546 F.2d 435, 441 (1st Cir.1976), *cert. denied*, 430 U.S. 906, 97 S.Ct. 1175, 51 L.Ed.2d 582 (1977); *Colella v. United States*, 360 F.2d 792, 802 (1st Cir.), *cert. denied*, 385 U.S. 829, 87 S.Ct. 65, 17 L.Ed.2d 65 (1966); *Gaunt v. United States*, 184 F.2d 284, 290 (1st Cir.1950), *cert. denied*, 340 U.S. 917, 71 S.Ct. 350, 95 L.Ed. 662 (1951). *See generally* 8A J. Moore, *Federal Practice* ¶ 29.05 (rev. ed. 1981).

Fusaro urges us to create an exception to this rule because his evidence was intro-

duced solely in response to the codefendant's testimony. This exception finds support in *Cephus v. United States,* 324 F.2d 893 (D.C.Cir.1963). Three critical facts distinguish *Cephus:* the government's case-in-chief was insufficient, 324 F.2d at 895; the defendant was severely prejudiced by application of the waiver rule, *id.* at 897, and the record was clear that the defense evidence was offered only because the codefendant testified, *id.* at 897 n. 19. Given these facts, the *Cephus* court felt compelled to create an exception to the waiver rule, *id.* at 897. Fusaro makes no attempt to establish the insufficiency of the government's case-in-chief. He is silent as to how application of the waiver doctrine prejudices him. Finally, nothing in the record indicates that Fusaro's evidence would not have been introduced if his codefendants had not testified. As such, even if we accepted *Cephus,* this appeal would not merit the creation of an exception to our long-standing and simple rule of waiver.

On the second day of trial an FBI agent held an animated five-minute conversation with the foreman of the jury. Called to the court's attention, the FBI agent testified that he had met the foreman at a local woodworking class, that at the time of the conversation the agent did not know the foreman was a juror, that the conversation in no way included any aspect of the trial, that the FBI agent had nothing to do with the case, and that, having learned the juror's status, the FBI agent had avoided any further contact with him. The court asked many questions of the agent designed to discover any prejudice. Fusaro's counsel indicated that he was satisfied that no prejudice had occurred, but he would check with his client. Shortly thereafter Fusaro's counsel moved to excuse the foreman. No counsel sought a voir dire of the foreman. The court denied the motion. This denial, according to Fusaro, requires us to reverse the judgment.

■ Fusaro's objections are similar to those raised and rejected in *United States v. Almonte,* 594 F.2d 261 (1st Cir.1979). The foreman in *Almonte* was aware of an encounter and prior relationship between an excused juror and a *witness.* Here the foreman had a seemingly harmless encounter with someone completely uninvolved in the case. Until Fusaro chose belatedly to object, everyone agreed that this minor incident did not require dismissal of the foreman. As in *Almonte,* we find that the trial court did not abuse its discretion. *Id.* at 266.

■ Finally, Fusaro urges us to reverse his convictions because the trial court allegedly abused its discretion when it refused Fusaro's presentation of a rebuttal witness who would have corroborated Fusaro's testimony. The rebuttal witness was offered to corroborate Fusaro's credibility, particularly with respect to his knowledge of Robidoux's financial condition. However, this issue was in contention—by virtue of the government's case-in-chief—and critical to Fusaro's defense. As such, Fusaro has not demonstrated why the testimony was not offered during his first opportunity to present evidence. The trial court did not abuse its discretion. *See United States v. Winkle,* 587 F.2d 705, 712 (5th Cir.), *cert. denied,* 444 U.S. 827, 100 S.Ct. 51, 62 L.Ed.2d 34 (1979). *See also Geders v. United States,* 425 U.S. 80, 86–87, 96 S.Ct. 1330, 1334, 47 L.Ed.2d 592 (1976).

## V

We now consider Robidoux's assignments of errors. Robidoux asserts that the district court committed reversible error when it failed to sever Robidoux's trial from Fusaro's because their defenses were antagonistic. Robidoux's defense was that he lacked the requisite intent because he reasonably relied upon the advice of his lawyer, Fusaro. Fusaro's defense was that he lacked the requisite intent and knowledge because Robidoux, his client, concealed the fraud.

Robidoux failed to raise properly the severance issue below. Robidoux joined Fusaro's pretrial severance motion, but the basis for the motion is completely dissimilar to the objection raised here. The motion was denied, and neither defendant advanced the

severance issue during the trial. Nevertheless, Robidoux argues that the trial judge had a *sua sponte* duty to order severance during the trial. We need not reach the question of this duty or whether Robidoux has preserved the issue, because even if the issue had been properly presented to the trial court, Robidoux would not be entitled to reversal of his conviction for failure to sever.

■■■■ A decision not to sever will be reversed only upon a showing of an abuse of discretion. *United States v. Talavera,* 668 F.2d 625, 632 (1st Cir.1982). As Robidoux correctly observes, it is easier to state generally than to apply particularly the maxim that some line exists beyond which codefendants' defenses are so antagonistic that a fair joint trial is impossible. *Talavera, supra; United States v. Berkowitz,* 662 F.2d 1127, 1132–35 (5th Cir.1981), and *United States v. Moschiano,* 695 F.2d 236, 245–47 (7th Cir.1982), all repeat the rule that codefenses must be truly irreconcilable, and Robidoux stresses the irreconcilability of the defenses at his trial. But the inescapable conclusion of these cases, all of which found no error in the failure to sever, is that tattling or "finger-pointing" is not enough. If the defendants agree on the basic facts, the who, what, when, and where, so to speak, the failure to sever is not an abuse of discretion. Robidoux fails to show why his defense is any more irreconcilable than the defenses in *Talavera, Berkowitz,* or *Moschiano.*[2]

2. Robidoux's reliance upon various district court opinions does not save his claim. *See United States v. Abrahams,* 466 F.Supp. 552 (D.Mass.1978); *United States v. Valdes,* 262 F.Supp. 474, 476 (D.P.R.1967). The issue here is appellate review for abuse of discretion, and these cases, distinguishable upon other grounds as well, are irrelevant to that inquiry.

3. What relief is available when an attorney and client are both the subject of a grand jury investigation and the attorney voluntarily violates the attorney-client privilege in his grand jury testimony is an unprecedented question. In dicta we have indicated that an attorney can be expected to assert the privilege, *In re Oberkoetter,* 612 F.2d 15, 18 (1st Cir.1980), and that a grand jury cannot violate a constitutional privilege, *United States v. Flaherty,* 668 F.2d

The conclusion that tattling is not enough is borne out by the one appellate case Fusaro cites in which a conviction was overturned for failure to sever. In *United States v. Johnson,* 478 F.2d 1129 (5th Cir. 1973), Johnson's defense was that he was not present at the crime; he could not and did not testify whether his codefendant was involved in a crime. Johnson's defense concerned identity and certainly cannot be characterized as tattling.

To be sure, other principles, such as the burden upon the prosecution of multiple trials, *see Berkowitz, supra,* or whether the codefendant was the government's best witness, *see Berkowitz, supra; Johnson, supra,* weigh in the balance of the severance decision. But these considerations hardly weigh in Robidoux's favor. The burden upon the prosecution of two or three twenty-day trials was obviously great. The government, moreover, was aligned with Robidoux in impeaching Fusaro's defense on precisely the same issue claimed as antagonistic here. As such, Fusaro was not the government's best witness against Robidoux. Indeed, Robidoux's argument stands in sharp contrast to Johnson, where the *only* evidence placing Johnson at the crime was the testimony of Johnson's codefendant.

■■■■ Robidoux next asserts that the indictment should be dismissed because the grand jury relied upon Fusaro's testimony which allegedly violated the attorney-client privilege.[3] Robidoux did not raise this ob-

566, 585 (1st Cir.1981). An indictment based upon evidence obtained in violation of the speech and debate clause (a privilege created by the Constitution itself) may be dismissed. *United States v. Helstoski,* 635 F.2d 200, 205 (3d Cir.1980). But these cases, contrary to Robidoux's assertion, do not establish that dismissal of an indictment in the instant circumstances is the only proper relief. As a compromise, Robidoux asserts that he is entitled to a post-indictment hearing retrospectively assessing the propriety of the privilege's assertion. That is, if the government did not have *prima facie* evidence of fraud absent Fusaro's grand jury testimony, the privilege was valid and the indictment should be dismissed. The government, not surprisingly, argues that an indictment based in part upon evidence which vio-

jection below, and therefore the district court's failure to dismiss the indictment is reviewable only for plain error. *United States v. St. Germain, supra;* Fed.R.Crim.P. 12(b), (f).

■ It was not plainly erroneous to fail to dismiss the indictment or to order an inquiry into Fusaro's grand jury testimony. Robidoux's contends that it became obvious that a violation of the attorney-client privilege occurred when Fusaro testified at trial because Fusaro was not impeached by his grand jury testimony. This is a logical jump which we find unsupported. It is more likely that Fusaro invoked either the attorney-client privilege or his own fifth amendment right before the grand jury. In either case, the government would not, as a strategic matter, have attempted to impeach him at trial by use of his grand jury testimony: the prior invocation of either privilege would not have tarnished Fusaro's in-court testimony. It was not obvious, therefore, either from the face of the indictment or Fusaro's testimony that Fusaro violated the privilege, and, as such, no reversible error occurred.

As his final objection, Robidoux asserts that he was denied effective assistance of counsel. Robidoux points to trial counsel's failure to advance the severance motion and attorney-client privilege violation discussed above, as well as the failure to object to certain aspects of Fusaro's testimony, the failure to file individual trial motions and supporting arguments, the failure to raise a *United States v. Perrotta,* 553 F.2d 247, 250 (1st Cir.1977), objection, and the failure to object to certain jury instructions.

As stated in *United States v. Campa,* 679 F.2d 1006, 1014 (1st Cir.1982):

> This circuit has adopted the "reasonably competent assistance" standard in reviewing such claims. This means that the quality of a defense counsel's representation should be within the range of competence of attorneys in criminal cases. *United States v. Thomann,* 609

F.2d 560, 566 (1st Cir. [1979] 1974); *United States v. Maguire,* 600 F.2d 330, 332 (1st Cir.1979); *United States v. Bosch,* 584 F.2d 1113, 1121 (1st Cir.1978). Under this standard, "effective representation is not the same as errorless representation." *United States v. Bosch,* 584 F.2d at 1121, citing *Marzullo v. Maryland,* 561 F.2d 540, 543, 545 (4th Cir.1977), *cert. denied,* 435 U.S. 1011 [98 S.Ct. 1885, 56 L.Ed.2d 394] (1978). Application of this standard does not mean that a court should "second guess reasoned choices between trial tactics," nor that defense counsel in order to protect himself against allegations of inadequacy must "waste the court's time with futile or frivolous motions." *United States v. Bosch,* 584 F.2d at 1121, citing *Cooper v. Fitzharris,* 551 F.2d 1162, 1166 (9th Cir.1977), *appeal after remand,* 586 F.2d 1325 (1978), *cert. denied,* 440 U.S. 974 [99 S.Ct. 1542, 59 L.Ed.2d 793] (1979); and *United States v. Wright,* 573 F.2d 681, 683–84 (1st Cir.), *cert. denied,* 436 U.S. 949 [98 S.Ct. 2857, 56 L.Ed.2d 792] (1978); *Moore v. United States,* 432 F.2d 730, 737 (3d Cir.1970).

■ Viewing these errors separately or in aggregate, we are convinced that Robidoux´ received effective assistance. The severance motion was probably futile. The attorney-client privilege violation was at best a novel claim and failure to spot it does not render counsel's assistance below the range of competence of attorneys. Robidoux fails to demonstrate how counsel's failure to file individual trial motions, make supporting arguments, or attend a pre-trial hearing would have altered any aspect of the trial. The alleged jury instruction errors are not substantially different from those unsuccessfully raised here by Fusaro and Saccone, and, likewise, do not rise to a showing of ineffectiveness. The failure to object to Fusaro's opinion testimony concerning Robidoux's state of mind appears to have been an explicit trial strategy of Robidoux to demonstrate that Fusaro was an

lates the attorney-client privilege is valid. Because the question was not properly raised below and the record does not plainly indicate

a violation, we need not and do not address this novel issue.

evil and vindictive man and the true culprit in the scheme. This strategy was obvious both in the opening and closing arguments as well as in Robidoux's own testimony. We refuse to second-guess such decisions. The alleged *Perrotta* error stands alone as an indication of possible ineffective assistance of counsel. Such a flimsy showing of ineffectiveness does not satisfy *Campa.*

We have considered all of the defendants' remaining objections and find them to be without merit.

The judgments of the district court are affirmed.