UNITED STATES of America

v.

Dale F. BENSON.

Cr. No. 83–016 P.

United States District Court,
D. Rhode Island.

July 25, 1983.

Robert Gammell, Asst. U.S. Atty., Providence, R.I., for plaintiff.

Alden Harrington, Providence, R.I., for defendant.

## OPINION

PETTINE, Senior District Judge.

The issue in this case is whether the delivery of loan proceeds to a party other than the borrower constitutes the willful misapplication of bank funds as that term is used in 18 U.S.C. section 656.

The defendant, Dale F. Benson, was indicted on a five-count indictment setting forth violations of 18 U.S.C. section 1005 and 18 U.S.C. section 2. The case was tried before this Court on June 7, 8, 9 and 19. At the conclusion of the Government's evidence, the defendant moved for a judgment of acquittal pursuant to Fed.R.Crim.P. 29. The Court took the matter under advisement; briefs were submitted and because of the time delay that would be caused by the preparation and study of said briefs, all parties agreed that the jury be discharged and any further proceedings be as a jury waived trial.[1] After studying and reading the briefs submitted on the Rule 29 motion, the Court concluded it would better serve justice to hear all the evidence rather than proceed on the purely technical grounds presented to the Court by the defendant's motion.

## FINDINGS OF FACT

This is a case where the "smell" of illegal deals is pungently convincing but the reality of the evidence shows no criminal conduct. The facts center around two loans and four individuals; Merle and Stuart Lyons, brothers, who, as truckers, had been doing business with the defendant, Dale F. Benson, hauling logs for the paper industry and Jim Eller, the loan officer of the lending bank, the Rhode Island Hospital Trust. Eller had negotiated a number of prior loans for Benson and apparently had a great deal of respect for him. He testified he considered Benson a "comer" and trusted him.

In order to "carry on", the Lyons brothers, who had been using two trucks owned by Benson, decided they should purchase these vehicles. They entered into a lease purchase agreement with Benson, whereby they would pay him $70,000.00; $24,000.00 would be the down payment with additional monthly payments of $4,000.00. Because the Lyons did not have the cash for the down payment, Benson offered to obtain financing for them. As a result, two separate loans were negotiated. The first of these for $9,000.00 was on May 10, 1980. It can be concluded after reviewing the evi-

---

1. The defendant was questioned in open court and there is no question that he made a know-ing and voluntary waiver of a jury trial.

dence that was introduced that Stuart Lyons received a Rhode Island Hospital Trust loan application from Benson; he completed and signed it together with a note and then returned these papers to Benson who in turn delivered them to Eller. Stuart testified that he knew what he had signed.

This loan is represented by two checks; one for $7,726.91 and another for $1,273.09. The $7,726.91 check was payable to the bank and was used to pay off a prior loan due the bank from Benson. The check for $1,273.09 was payable to Benson and was endorsed by him.

The second loan transaction is reflected on a May 21, 1980 loan application for $16,000.00 purportedly signed by Merle Lyons. He disclaims the signature as his and further states he did not authorize anyone to sign on his behalf. In support of this loan, there is also an application supposedly from Stuart Lyons; he neither denies nor admits the signature is his—he simply cannot say. This loan is also represented by a bank secretary check, for $7,279.83, payable to defendant Benson. The balance of the loan was used to pay off or amortize loans Benson had with the bank. It is uncontradicted that all the proceeds from both these loans were either received by Benson, deposited to his account or credited to him. In turn, the Lyons were credited by Benson with the $24,000.00 down payment on the trucks, which they were using in their business.

Referring again to the applications for these loans, there is, indeed, a great deal of murkiness surrounding their execution. As already stated, they were obtained in blank by Benson from the bank's loan officer Eller and then returned by Benson to the bank fully executed. Merle claims his signature was forged and Stuart straddles the issue as to the $16,000.00 loan. However, there is no evidence that Eller suspected or should have suspected any irregularities. He accepted these applications and completed a credit check on each as is done in the normal course of business for any loan; he evaluated them and concluded it was appropriate to make the loans. In due course, he mailed the payment book to the Lyons brothers, who then made their monthly payments directly to the bank. During this time, the Lyons had possession and full use of the trucks, albeit, they remained registered to Benson.

All went well until the fifth month following the date of these transactions when the Lyons brothers defaulted in making their $4,000.00 monthly payment to Benson; he repossessed the trucks and the Lyons then refused to make any further payments to the bank.

Another primary fact must be added; before the transactions in question, Eller was specifically ordered by his superiors not to make any further loans to Benson who in turn was so advised. The Government argues that, therefore, in making and receiving the loans in question, the parties to the transaction deliberately disobeyed a bank policy which placed a dollar limitation on the amount of money Benson could borrow. *United States v. Fusaro*, 708 F.2d 17 (1st Cir.1983); *United States v. Moraites*, 456 F.2d 435 (3rd Cir.), *cert. denied*, 409 U.S. 891, 93 S.Ct. 109, 34 L.Ed.2d 148 (1972); *United States v. Cooper*, 577 F.2d 1079 (6th Cir.), *cert. denied*, 439 U.S. 868, 99 S.Ct. 196, 58 L.Ed.2d 179 (1978). Of course, this argument need only be considered, if, indeed, the loans in question were to Benson.

The Government's position is that Eller knowingly defrauded the bank by negotiating "dummy" loans whereby the money ended up in the hands of a third party rather than the named debtor, thus concealing his identity. *United States v. Gens*, 493 F.2d 216, 221–22 (1st Cir.1974). The Government stresses that Benson was not an agent for the Lyons brothers; neither brother ever communicated or dealt with Eller concerning Benson becoming their agent. Since this is the first time Eller has ever dealt with a transaction between Benson and the Lyons, there exists no past practice upon which to base a reasonable inference that Benson is the Lyons' agent. There being no actual or apparent authority, there can be no agency established. In the absence of an agency relationship, the

government contends that the actions of Eller and Benson can only lead to the conclusion that the purpose of the transaction was to conceal the true recipient of the funds, namely, Benson himself. Government's Brief p. 5. *United States v. Cooper,* 577 F.2d 1079 (6th Cir.1978); *U.S. v. Krepp,* 605 F.2d 101 (3rd Cir.1970); *U.S. v. Gens,* 493 F.2d 216 (1st Cir.1974).

The single all important fact determination that must be made is whether these loans were indeed made to Benson in violation of bank policy or were in fact intended by Eller to be, as purported, loans to Lyons. If they were indeed loans to Benson then, of course, concealment and fraud may be rightfully argued. The strongest supportive point is the act of delivering the proceeds to Benson. The ultimate question is whether this establishes the "sine qua non" of the charge of willful misapplication of bank funds; that is, did Eller in delivering the proceeds to Benson know that such act would prove harmful to the financial health of the bank; did he act with intent to harm the bank, that is, in reckless disregard for the "financial health of the bank." *United States v. Fusaro,* 708 F.2d 17 (1st Cir.1983).

The analysis must start with the statute in question; 18 U.S.C. section 656 reads:

Whoever, being an officer, director, agent or employee of . . . an insured bank . . ., embezzles, abstracts, or willfully misapplies any of the moneys, funds or credits of such bank. . ., shall be fined. . . .

The defendant was also indicted for violating 18 U.S.C. section 1005 which reads in pertinent part as follows: "Whoever makes any false entry in any book, report or statement of such bank with intent to injure or defraud such bank. . ." shall be fined or imprisoned. Since my ruling finds that there was no willful misapplication, it disposes of both sections 656 and 1005.

Benson, not being "an officer, director, agent or employee" of the bank, can only be judged as an aider and abettor. Therefore, it follows he cannot be found guilty unless the individual he supposedly aided is guilty of the substantive offense and that he knew of Eller's intent to defraud the bank.

Misapplication is an essential element of the substantive offense. A simple reading of the statute tells us that three essential elements are required to be proved beyond a reasonable doubt in order to establish Eller's guilt:

First, that Eller was an officer or employee of the Rhode Island Hospital Trust National Bank, a bank insured by the Federal Deposit Insurance Corporation. This is established.

Second, that Eller misapplied funds, names or credits of the bank.

Third, that he acted willfully and with intent to injure or defraud the bank.

The difficult question in these cases is to determine what conduct "willfully misapply" actually proscribes and singles out for criminal sanctions. Here the problem compounds itself because the defendant is charged with aiding and abetting and, as already stated, there can be no conviction without this defendant's knowledge of Eller's intent to defraud the bank.

There can exist the anomalous situation of an independent guilt of some crime on the part of the aider and abettor but insufficient evidence to support a conviction of aiding and abetting in a "willful misapplication" of the bank funds. For example, it can be argued that the evidence here could support a finding that Benson knowingly gave to Eller a loan application with a forged signature to obtain money for his own use. Be that as it may, the underpinning of the charge at issue is Eller's guilt and the defendant's knowledge of it. Judge Friendly, writing for the court in *United States v. Docherty,* 468 F.2d 989 (2nd Cir.1972) pointed out that:

The words "willfully misapply" first appeared in the Act of June 3, 1864, ch. 106, § 55, 13 Stat. 116, which, in addition, required proof of intent "to injure or defraud the [banking] association or any other company or body politic or corporate, or any individual person, or to deceive any [bank] officer . . ., or any agent appointed to examine the affairs of [the bank] . . ." The Act of April 6, 1869, ch.

11, 16 Stat. 7, added an aiding or abetting offense.

The phrase "willfully misapply" has proved troublesome from the outset. In *United States v. Britton,* 107 U.S. 655, 669, 2 S.Ct. 512, 524, 27 L.Ed. 520 (1883), the Supreme Court, answering certified questions with respect to a multi-count indictment under the statute, noted that:

> The words "willfully misapplied" are, so far as we know, new in statutes creating offenses, and they are not used in describing any offense at common law. They have no settled meaning like the word "embezzle," as used in the statutes, or the words, "steal, take and carry away," as used at common law.

Particularly relevant is the Court's discussion of a count charging the bank president with having used funds of the bank to purchase its own stock, which he held in trust for the bank's use.

Conceding that such a purchase by the bank itself, except to secure a debt, would be forbidden·by law, the Court held that this count did not set forth an offense, stating 107 U.S. at 666–667, 2 S.Ct. at 522 (emphasis added):

> We think the willful misapplication made an offense by this statute means a misapplication for the use, benefit or gain of the party charged, or of some company or person other than the

[banking] association. Therefore, to constitute the offense of willful misapplication, there must be a *conversion* to his own use or of some one else of the moneys and funds of the association by the party charged.

See, to the same effect, *United States v. Northway,* 120 U.S. 327, 332, 7 S.Ct. 580 [583], 30 L.Ed. 664 (1887). It would follow that, to support a conviction for aiding and abetting in a "wilful misapplication," the alleged aider or abettor must have knowledge that the officer intended to effect a conversion. The Court also stated in *Britton,* 107 U.S. at 667, 2 S.Ct. at 522, that the counts relating to the stock purchase "[charged] maladministration of the affairs of the bank, rather than criminal misapplication of its funds" and that, if the counts were held to be good, "every official act of an officer, clerk or agent of a banking association by which its funds are applied in a way not authorized by law, would be punishable . . ." It would seem to follow *a fortiori* that mere knowledge that the transactions here at issue violated a bank rule would not suffice to·support a conviction for aiding and abetting.

*Id.* at 993.

Judge Friendly then analyzed a number of cases upholding convictions for willful misapplication.[2]

---

**2.** Judge Friendly observed:

The cases where courts of appeals have upheld convictions for willful misapplication have involved a considerably greater degree of iniquity or of foreseeable loss than anything of which Docherty knew. Willful misapplication has been found, for example, when a bank employee knowingly engaged in a check "kiting" scheme for the benefit of depositors, *United States v. Mullins,* 355 F.2d 883 (7 Cir.), cert. denied, 384 U.S. 942, 86 S.Ct. 1465, 16 L.Ed.2d 540 (1966); when a bank employee paid money out to a customer on a check he knew was backed by insufficient funds and then concealed the overdraft, *Logsdon v. United States,* 253 F.2d 12 (6 Cir.1958); when a bank officer loaned money without security knowing that the borrower could not repay, *Robinson v. United States,* 30 F.2d 25 (6 Cir.1929); when a depositor repeatedly overdrew his account, knowing that the branch manager was consistently

ignoring this, *Benchwick·v. United States,* 297 F.2d 330 (9 Cir.1961); when a bank officer caused his bank to borrow from another and pocketed the proceeds, leaving his own bank only with a personal note of an employee of the lending bank which he had no reason to think would be paid, *Hargreaves v. United States,* 75 F.2d 68 (9 Cir.), cert. denied, 295 U.S. 759, 55 S.Ct. 920, 79 L.Ed. 1701 (1935); and, as we have recently held, when a bank officer pocketed the proceeds of loans knowingly issued on the strength of fraudulent loan applications, *United States v. Fortunato,* 402 F.2d 79 (2 Cir.1968), cert. denied, 394 U.S. 933, 89 S.Ct. 1205, 22 L.Ed.2d 463 (1969). On the other hand, *Johnson v. United States,* 95 F.2d 813 (4 Cir.1938) (Soper, J.), held that no crime was charged when the indictment alleged only that a bank president, whose conduct was characterized with a copious array of pejorative adverbs, had discounted a note payable to himself and

Defense counsel rightfully cites *United States v. Gens,* 493 F.2d 216 (1st Cir.1974) as listing types of cases in which courts had found willful misapplication, such as sham loans where the proceeds go to a party other than the borrower who is either fictitious or unaware that his name is being used; bank officer knowing that the loan proceeds were intended for a third party and that the named borrower was incapable of repaying the loan; loan proceeds were intended for a third party and the named borrower was told he would not be responsible for paying. The common theme interwoven in the legion of fact situations supporting willful misapplication cases is the natural tendency and intent of the bank officer to injure or defraud the bank. To put it another way, "... the sine qua non of charges of willful misapplication of bank funds is action taken with the knowledge of harm to, intent to harm, or reckless disregard for the financial health of the bank." *United States v. Fusaro, supra,* at 21. *See United States v. Mann,* 517 F.2d 259 (5th Cir.1975), *cert. denied,* 423 U.S. 1087, 96 S.Ct. 878, 47 L.Ed.2d 97 (1976); *Giragosian v. United States,* 349 F.2d 166 (1st Cir.1965).

In this case, I find that Eller intended the loans be made to Lyons. This finding is based on the following facts:

1. Stuart Lyons readily acknowledged the validity of the $9,000 loan application; he neither admitted nor denied the validity of his signature on the $16,000 loan application. Both these applications were given to Eller. There is no evidence that he had cause to suspect they were not genuine, albeit Merle Lyons claims his signature was forged.

2. Eller completed a credit check to verify the information on the applications.

3. Eller mailed to the Lyons brothers the coupon payment books; he looked to them for payment.

Buttressing the foregoing, the evidence established that:

applied the proceeds to his own account, in order to meet an overdraft. The court found the indictment flawed since there was no

a) both brothers acknowledged negotiating with Benson for the purchase of the trucks and the need for a loan to satisfy the down payment of $24,000;

b) for ten months the Lyons brothers made their monthly payment to the bank on these loans; and finally,

c) it is recorded the $24,000 down payment on the trucks was credited to Lyons.

I conclude there was no misapplication of bank funds, whatever may have been Benson's motive. The measure of proof is beyond a reasonable doubt and this has not been satisfied.

It is true that Eller testified that what he did was wrong. This does not mean, however, that there was a criminal misapplication of the bank's money. Besides, I find it difficult to understand why Eller even made such a statement and yet admitted that it was not so very unusual in an automobile financing transaction to pay the proceeds directly to the seller of the car rather than the purchaser. Eller received nothing from these transactions and though he may have condemned himself believing he acted irregularly, "or he may have acted incautiously ..., or may have used bad judgment in making the loans ... such action does not rise to criminal dimensions." *Giragosian v. United States, supra,* 349 F.2d at 169.

The penchant of prosecutors to stretch "this highly penal statute beyond all reasonable limits" is a pervasive mischief. The writer throws this stone though he once lived in the "glass house" of the *Giragosian, supra,* prosecution. The time has come when greater care be given to the factual predicate of criminal accusations. Every breach of a bank regulation does not constitute a criminal misapplication. Courts have repeatedly interpreted the statute at issue here consistently with this opinion. As far back as 1883 the United States Supreme Court stated:

This might be an act of maladministration on the part of the defendant. It

allegation that the maker was known to be insolvent or to have an intention not to pay. *U.S. v. Docherty, supra,* at 994.

might show neglect of official duty, indifference to the interests of the association ...; but to call it a criminal misapplication by him of the monies and funds of the association, would be to stretch the words of this highly penal statute beyond all reasonable limits.

*United States v. Britton,* 108 U.S. 193, 199, 2 S.Ct. 526, 531, 27 L.Ed. 701 (1883).

It is settled by the decisions of the Court that the misapplication condemned by the statute is something more than an irregular or improper use of the bank's funds. Fraud must be found and some conversion of the funds of the bank to be used or gained ... of one other than the bank.

*Johnson v. United States,* 95 F.2d 813, 816.

The law does not treat as a misapplication the making of a bad loan, or a careless or negligent handling of bank money.

*United States v. Gallagher,* 576 F.2d 1028, 1046 (3rd Cir.1978), *cert. dismissed,* 444 U.S. 1040, 100 S.Ct. 713, 62 L.Ed.2d 675 (1980).

In sum, Eller's only indiscretion was delivery of the funds to Benson, which simply is not enough to give rise to criminal responsibility. Benson's fortunes in this case hinged on Eller's conduct—simply because of the charge placed against him. This finding does not exonerate any malefactor for other crimes, if any exist. It does not condone a loan on a forged signature given to the bank by Benson, if indeed it was forged. Perhaps the true inquiry in this case lies in other areas rather than the one pursued here.

I hereby find the defendant not guilty.