UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 90-1174

UNITED STATES OF AMERICA,

Appellee,

v.

SHELDON ARTHUR YEFSKY,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. David S. Nelson, Senior U.S. District Judge]

Before

Torruella, Circuit Judge,

Coffin, Senior Circuit Judge,

and Cyr, Circuit Judge.

Theodore L. Craft for appellant.

Louis M. Fischer, Attorney, Department of Justice, with whom A.

John Pappalardo, United States Attorney, was on brief for appellee.

May 3, 1993

-1-

COFFIN, Senior Circuit Judge. Sheldon Yefsky was convicted

by a jury of a dual-object conspiracy, in violation of 18 U.S.C.

371 and 1341, and of four counts of mail fraud, unrelated to

the conspiracy, in violation of 18 U.S.C. 1341. On appeal,

Yefsky raises a number of challenges to his conviction. After an

exhaustive review of the record, we affirm.

I.

We begin with a brief description of the facts and

proceedings.

The Greater Boston Police Council (GBPC) was formed in the

early 1960s as a mutual aid society for various metropolitan area

law enforcement agencies. The GBPC enabled its members to

purchase equipment at reduced prices pursuant to collective

purchase agreements. As an unincorporated association, the GBPC

relied on one of its members to act as its fiduciary agent.

At all times relevant to this case, the Town of Newton,

whose police chief William Quinn served as the chair of the GBPC,

fulfilled that role. Quinn, in turn, relied heavily on Timothy

Coogan, a civilian employee of the police department, to conduct

the daily operations of the GBPC. Coogan became a full-time

employee after graduating from law school and ended his

affiliation with Newton in mid-1985, when the offenses underlying

this case surfaced.

A primary concern of the GBPC was the inability of the

member police departments to communicate with each other by

radio. To solve this problem, the GBPC undertook a project to

develop an integrated radio system for its members. This system

became known as the Boston Area Police Emergency Radio Network

(BAPERN).

In 1975, the GBPC hired a Chicago-based firm, Computer and

Engineering Services (CES), of which Yefsky is president, to

assess the existing radio systems. One year later, CES was

awarded a bid contract of $31,000 to design and implement BAPERN.

The system used Motorola equipment, which was available at a

discount through a GBPC collective purchase contract.

By June 1978, BAPERN was fully operational, connecting 23

cities and towns, and Coogan had became the BAPERN project

director and general counsel and administrator for the GBPC. In

these capacities, Coogan exercised financial and administrative

control of GBPC affairs, including the BAPERN project. He

encouraged organizations to join BAPERN and recommended CES to

them for engineering and design work. Coogan alone received

shipping orders from BAPERN members to the GBPC, prepared

GBPC/Newton shipping orders to CES and Motorola, approved

invoices from these businesses to the GBPC/Newton for payment,

prepared bills from the GBPC/Newton to the BAPERN members, and

received the members' payments. Newton officials, including

Quinn, merely rubber stamped his work. Coogan was, in many

respects, the person most identified with the GBPC.

In 1985, the Internal Revenue Service (IRS) began an

investigation of Coogan, which revealed large amounts of income

that he had not reported to the IRS. The unreported income

-3-

stemmed from two sources. First, Coogan had become a paid

consultant to International Telecommunications Service, Inc.

(ITS), a subsidiary of CES, to perform engineering field work on

the BAPERN system. Second, Coogan had overcharged GBPC members

for radio equipment and had diverted the overcharge to a secret

bank account for his personal use.

In 1989, Coogan, Yefsky, his son Michael Yefsky, the

president of ITS, and Samuel Diamond, the financial officer and

tax preparer for CES and ITS, were charged with numerous criminal

violations stemming from their involvement in the BAPERN project.

The indictment charged the existence of two separate schemes to

defraud members of the GBPC and charged Coogan alone with tax

fraud for concealing his illicit profits from both schemes

(Counts 2-4).

The first scheme charged was a conspiracy involving all four

defendants (Count 1). The goals of the conspiracy were to pay

Coogan kickbacks for sending engineering work to CES and to help

him hide that income from the IRS. The kickbacks were the

payments ITS made to Coogan, allegedly for his field services.

At trial, the government explained that the kickbacks were

financed by charging GBPC members for engineering services that

were unnecessary or never were performed or by overcharging for

work actually done.

The second intrigue implicated Coogan and Yefsky in a mail

fraud scheme based on the equipment overcharge and diversion of

funds for Coogan's personal use (Counts 5-14). The government

-4-

consistently has admitted that this was a scheme distinct from

the engineering conspiracy. The mailing of ten payments for

equipment, maintenance fees, and BAPERN expansion fees by member

organizations comprised the individual mail fraud counts.

A tedious and rambling trial stretching 86 days ensued.

Over 1000 exhibits were admitted, with more than half subjected

to limitations as to the various counts and defendants. The

government alone consumed 44 days and 878 exhibits to present its

case-in-chief. Yefsky used another 24 days and 376 exhibits to

present his defense. The thrust of his defense was that he did

not join in either the conspiracy or the equipment scheme but was

a pawn of Coogan.

At the trial's conclusion, the jury convicted Coogan of all

14 counts against him. It convicted Yefsky of the conspiracy

count and 4 of the 10 mail fraud counts. It also convicted

Michael Yefsky and Diamond of the conspiracy count, the only

charge against them.

During the proceedings below, Yefsky made many motions, the

decisions of which form the bases of this appeal. These motions

include a motion for acquittal based on insufficiency of the

evidence; a motion to dismiss the indictment for insufficiency

and double jeopardy; a motion for severance; and an omnibus

motion for a new trial that reiterated many of these issues as

well as errors at trial.

Yefsky, his son, and Diamond appealed their convictions.

The government then conceded the insufficiency of the evidence

-5-

supporting the convictions of Michael Yefsky and Diamond, and the

verdicts against them were set aside and dismissed. United

States v. Yefsky, Memorandum and Order, Nos. 90-1222, -1240 (1st

Cir. Jan. 29, 1993). Coogan did not appeal his conviction.

Yefsky's appeal remains, and we turn now to the issues he raises.

II.

Yefsky contends that the district court erred in denying his

motion, renewed at close of trial, for acquittal based on

insufficiency of evidence. When reviewing a motion for

acquittal, we consider the evidence in the light most favorable

to the prosecution. United States v. Torres Lopez, 851 F.2d 520,

527 (1st Cir. 1988). We, therefore, "draw[] all legitimate

inferences and resolv[e] all credibility determinations in favor

of the verdict." United States v. Angiulo, 897 F.2d 1169, 1197

(1st Cir. 1990).

A. The Conspiracy Count

To support a verdict of guilt, the evidence must prove each

element of a conspiracy beyond a reasonable doubt. These

elements are the existence of a conspiracy, the defendant's

knowledge of it, and his voluntary participation in it. United

States v. David, 940 F.2d 722, 735 (1st Cir. 1991). To prove

voluntary participation, the government must show that the

defendant intended both to agree with his co-conspirators and to

commit the substantive offense. Id. Moreover, when the

commission of mail fraud is a goal of the conspiracy, the

government must show either an intent to use the mails or the

-6-

reasonable foreseeability of such use. United States v. Dray,

901 F.2d 1132, 1137 (1st Cir. 1990). We turn now to the facts

that the jury reasonably could find in support of the verdict.

In 1979, the relationships among the GBPC, Coogan, and

Yefsky changed, allowing the conspiracy to germinate. First,

Coogan was forced to leave regular employment with the Newton

Police Department because he was maintaining a private law

practice. He became instead a consultant to the Department and,

in 1980, to the GBPC. His duties, however, remained the same:

assistant to Quinn (as police chief and GBPC chair),

administrator of and general counsel to the GBPC, and project

director of BAPERN. In addition, his contracts permitted him to

engage in other telecommunications consulting work.

Second, government funding and oversight of the BAPERN

project ended. Coogan then prepared an open-ended consulting

contract for CES that defined its role during the expansion of

BAPERN. The new contract called for CES to provide engineering

services as requested by shipping orders issued through Newton on

behalf of the GBPC members.

The CES contract did not permit CES to use subcontractors

without written consent from Newton. Nonetheless, in December

1979, CES entered a contract with ITS by which ITS would perform

field implementation studies and services for various CES

projects, including BAPERN, and CES would pay ITS's salaries and

overhead expenses.

-7-

At some point during this period, Coogan approached Yefsky,

proposing to become CES's local "clerk of the works" for the

BAPERN project. In December 1979, Coogan entered a contract with

ITS to provide field engineering; site, installation and testing

supervision; and training for the BAPERN expansion. Unlike

Yefsky's other subcontractors, Coogan was paid a fixed price for

each project on which he worked and was not required to submit

time sheets to corroborate his fee. Neither Yefsky nor Coogan

ever revealed their subcontracting relationship to the GBPC.

Coogan, in fact, repeatedly denied to Chief Quinn engaging in any

outside telecommunications consulting work.

From 1980 to mid-1985, 25 to 30 organizations joined the

BAPERN system. Coogan recommended CES to many of them for

engineering work. As a result, CES's income skyrocketed; during

this period, the firm received approximately $964,000 for

engineering services relating to BAPERN. More than half of the

payments were for field work billed by Coogan. Coogan, in turn,

received approximately $484,760 from ITS for his services. CES

reimbursed ITS for this and other expenses, pursuant to their

subcontract.

Many of the payments for engineering were inflated or

unnecessary. Yefsky himself testified that he had not performed

work for some of the police departments that had paid for

engineering services. Some departments also paid more to the

GBPC than CES had billed GBPC. Payments routinely were sent to

the GBPC by mail.

-8-

Coogan did not report his ITS income to the IRS. Nor did

ITS file Forms 1099 with the IRS to reflect payments to Coogan.

ITS did, however, list the consulting fees as business expenses

on its corporate tax returns. CES also listed its payments to

ITS as business expenses.1

From these facts, the jury reasonably could draw a series of

inferences to connect Yefsky to the mail fraud prong of the

conspiracy. The jury could find that, once government oversight

ended, Coogan and Yefsky grasped an opportunity to make money out

of the BAPERN project. Thus, it could find that Coogan drafted

the open-ended CES contract so that CES could pay him kickbacks

to steer work orders to CES. It also could find that CES and

Coogan financed the kickbacks by charging inflated fees for

engineering work actually performed or completely false fees for

work never performed. Accordingly, the jury could find that

Yefsky and Coogan agreed to enrich themselves by defrauding the

members of BAPERN.

Because we find the evidence sufficient to support Yefsky's

conviction of conspiring to commit mail fraud, we uphold his

conviction on Count 1 without considering the sufficiency of the

evidence supporting the tax fraud object. See Griffin v. United

States, 112 S. Ct. 466, 473-74 (1991) (evidence supporting one

1 CES and ITS had taken deductions for their payments to
Coogan. But they were never indicted for tax fraud in connection
with the kickback scheme. Although the two companies were
audited by the IRS, they were not required to pay additional
taxes for the years in question.

-9-

object of dual-object conspiracy held sufficient to support

conspiracy conviction).

B. The Mail Fraud Counts

The indictment charged Yefsky and Coogan with ten counts of

mail fraud in connection with the equipment overcharge scheme.

Each mailing represented a payment from a BAPERN member that

Coogan diverted to his secret bank account. Yefsky was convicted

of four of the ten counts.

A conviction for mail fraud2 requires proof of two elements

beyond a reasonable doubt. They are the defendant's

participation in a scheme to defraud and the use of the mails,

either by or caused by the defendants, in furtherance of the

scheme. United States v. Serrano, 870 F.2d 1, 6 (1st Cir. 1989).

The defendant need not instigate the scheme so long as he

willfully participates in it, with the knowledge of its

fraudulent nature and with the intent to achieve its illicit

objectives. Id. (citing United States v. Price, 623 F.2d 587,

591 (9th Cir. 1980)).

2 The mail fraud statute, 18 U.S.C. 1341, provides in
relevant part:

Whoever, having devised or intending to devise any
scheme or artifice to defraud, or for obtaining money
or property by means of false or fraudulent pretenses,
representations, or promises, . . . for the purpose of
executing such scheme or artifice or attempting so to
do . . . takes or receives [from the Postal Service]
any such matter or thing, or knowingly causes to be
delivered by mail according to the direction thereon .
. . shall be fined not more than $1,000 or imprisoned
not more than five years, or both.

-10-

A mailing falls within the scope of the fraud if it is

sufficiently connected to the scheme to defraud and reasonably is

foreseeable as a result of the participants' actions. United

States v. Pacheco-Ortiz, 889 F.2d 301, 305 (1st Cir. 1989);

United States v. Silvano, 812 F.2d 754, 760 (1st Cir. 1987). The

mailing of proceeds of a fraudulent scheme is sufficient to

uphold a conviction for mail fraud. Silvano, 812 F.2d at 760

(citations omitted).

Yefsky challenges the sufficiency of evidence linking him to

the scheme to defraud and to the mailings. Because each count of

which he was convicted undisputedly represents a mailing of

proceeds of the scheme, Yefsky's convictions must be affirmed if

the evidence sufficiently supports his participation in the

scheme to overbill for equipment. We turn, therefore, to the

evidence of Yefsky's participation in the equipment scheme.

In 1982, the GBPC negotiated a new contract with Motorola

for the purchase of equipment. Yefsky assisted Coogan in the

negotiations, which resulted in deeper discounts for BAPERN

members. Coogan then began to bill BAPERN members inflated

prices for Motorola equipment. He also provided false price

lists, representing them as part of the Motorola contract, to

corroborate the prices he charged. A Motorola employee testified

at trial that a comparison of Motorola bills with GBPC bills for

equipment revealed that Coogan had overcharged BAPERN members by

at least $888,000.

-11-

Coogan deposited the overcharge into a bank account opened

under GBPC's name but without its knowledge or authorization. He

was the only person authorized to withdraw funds from this

account. By December 1984, over $1.5 million had been deposited

into the account. Coogan diverted this money for personal use,

such as purchasing certificates of deposit and paying mortgages.

The government conceded at oral argument that Yefsky had no

knowledge of this account and did not share in the proceeds from

the overcharge.

Yefsky, however, was present at meetings when inflated

prices were quoted and discussed. He also recommended the kinds

of equipment to be purchased to organizations joining BAPERN and

included inflated price lists, obtained from Coogan, in

feasibility studies he conducted for two organizations.

The facts connecting Yefsky to the equipment scheme are not

as numerous as those connecting him to the engineering

conspiracy. Nonetheless, the jury could conclude that Yefsky

knew that the equipment prices were being inflated because he had

helped to negotiate the purchase agreement that established the

legitimate prices. It could conclude that Yefsky then joined the

equipment scheme by supporting and using Coogan's quotations of

inflated prices. It also could conclude that Yefsky entered the

scheme to ensure Coogan's ongoing participation in the

engineering conspiracy. These inferences and the facts

supporting them are sufficient to sustain Yefsky's convictions of

mail fraud.

-12-

III.

Yefsky next challenges the adequacy of the indictment,

claiming that the engineering fraud prong of the conspiracy count

was defective because it did not specify the false pretenses

used.3 He contends that this defect deprived him of the ability

to present a meaningful defense. The district court agreed that

the count did not specify the false pretenses alleged but

determined that the indictment as a whole sufficiently warned

Yefsky of the charges against him. Memorandum and Order,

December 20, 1988, at 2. It therefore refused to dismiss the

engineering fraud count. We disagree with the district court's

decision but find its error harmless.

Rule 7(c)(1) of the Federal Rules of Criminal Procedure

requires an indictment to provide "a plain, concise and definite

written statement of the essential facts constituting the offense

charged." The Supreme Court has instructed that an indictment is

sufficient if it contains the elements of the offense charged,

fairly informs the defendant of the charges against which he must

defend, and enables him to enter a plea without fear of double

jeopardy. Hamling v. United States, 418 U.S. 87, 117 (1974);

accord, United States v. Serino, 835 F.2d 924, 929 (1st Cir.

3 The original indictment charged the engineering fraud in
Count 5 as a conspiracy separate from the tax fraud conspiracy.
When the district court ordered that the two be consolidated, the
allegations of the engineering fraud were incorporated virtually
verbatim into Count 1. Thus, Yefsky's motion to dismiss Count 5
applies on appeal to Count 1 of the superseding indictment. We
refer to the original Count 5 as the "engineering conspiracy" or
the "engineering fraud" to avoid confusion with the tax fraud
prong of the conspiracy now charged.

-13-

1987). The indictment may incorporate the words of the statute

to set forth the offense, but the statutory language "`must be

accompanied with such a statement of the facts and circumstances

as will inform the accused of the specific offense, coming under

the general description, with which he is charged.'" Hamling,

418 U.S. at 117-18 (quoting United States v. Hess, 124 U.S. 483,

487 (1888)). An indictment for conspiracy, however, need not

allege the predicate offense with the same precision as the

substantive count. Wong Tai v. United States, 273 U.S. 77, 81

(1927); United States v. Fusaro, 708 F.2d 17, 23 (1st Cir. 1983).

Focusing on this last principle, the government argues that

the indictment passes muster. It urges that the challenged

count's imprecision regarding the mail fraud objective is

irrelevant. Because the count clearly charged an agreement to

defraud by use of the mails, the government argues that Yefsky

was able to prepare a defense to the conspiracy charge.

We disagree. "`Where guilt depends so crucially upon such a

specific identification of fact, our cases have uniformly held

that an indictment must do more than simply repeat the language

of the criminal statute.'" Hamling, 418 U.S. at 118 (quoting

Russell v. United States, 369 U.S. 749, 764 (1962)) (emphasis in

Hamling). We think a mail fraud conspiracy depends so crucially

on the underlying fraud that the fraud also must be specified in

the applicable count.

-14-

We reach this conclusion based on the unusual nature of mail

fraud. A multi-member mail fraud is itself treated like a

conspiracy. See Serrano, 870 F.2d at 6 (multi-member fraud

requires each member to participate in common scheme with intent

to commit fraud); see generally United States v. Wormick, 709

F.2d 454, 461 (7th Cir. 1983) (applying conspiracy principles to

multi-defendant mail fraud indictment). Thus, the engineering

conspiracy count essentially charged Yefsky with agreeing to

commit another conspiracy.4 Yefsky could not be expected to

defend himself from a charge of conspiring to join a conspiracy

to perpetrate a fraud if the indictment did not identify the

fraud that was the ultimate underlying offense.

It is undisputed that the engineering conspiracy count did

not identify the plan used to defraud the GBPC. The count

alleged only that Coogan had used his control over the GBPC to

arrange CES's open-ended engineering contract in 1979, that

Coogan had signed a contract with ITS to provide field services,

that CES received approximately $964,000 under its new contract,

and that ITS paid Coogan $484,760. None of these allegations, on

their face, describe fraudulent conduct. The count then stated

in conclusory language drawn from the mail fraud statute that

Coogan had obtained this money from the GBPC members through

false pretenses. It did not divulge the factual basis of this

4 Yefsky, of course, could have been charged with both
conspiracy to commit the engineering fraud and with the
substantive mail fraud without risking double jeopardy. See

infra Section VI.

-15-

accusation. Accordingly, the count did not provide Yefsky with

adequate notice of the charge against him. Cf. United States v.

Nance, 533 F.2d 699, 702 (D.C. Cir. 1976) (noting with approval

mail fraud count that specifies misrepresentations); United

States v. Curtis, 506 F.2d 985, 990 (10th Cir. 1974) (citations

omitted) (dismissing mail fraud indictment that excludes false

pretenses).

The district court, however, upheld the sufficiency of the

indictment because it held that "such specification can be

inferred from a reading of the entire indictment." Memorandum

and Order at 2. The substantive mail fraud counts specified that

Coogan and Yefsky had charged inflated rates for equipment. The

court reasoned that the similarity of the engineering conspiracy

and the substantive equipment scheme enabled Yefsky to determine

that the false pretenses used for the conspiracy must have been

overcharges for engineering services.

Contrary to the district court's ruling, the deficiency in

the count was not curable by reading the indictment as a whole.

"`Each count in an indictment is regarded as if it was a separate

indictment.'" United States v. Winter, 663 F.2d 1120, 1138 (1st

Cir. 1981) (quoting Dunn v. United States, 284 U.S. 390, 393

(1932)); 1 Charles A. Wright, Federal Practice and Procedure:

Crim. 2d (Federal Practice and Procedure) 123 at 349 (1982).

Thus, each count must be sufficient without reference to other

counts unless the allegations of those counts expressly are

incorporated. Winter, 663 F.2d at 1138 (quoting United States v.

-16-

Fulcher, 626 F.2d 985, 988 (D.C. Cir. 1980)); 1 Federal Practice

and Procedure 123 at 349. The engineering conspiracy count did

not incorporate any of the allegations underlying the equipment

fraud counts. We therefore review it standing alone, and, as it

was written, the engineering conspiracy count was defective.

Indeed, there is no reason for the conspiracy count to refer

to the separate equipment fraud counts. Although it makes sense

to read a conspiracy indictment as a whole when the substantive

offenses also are the objects of the conspiracy, see, e.g.,

Fusaro, 708 F.2d at 23, the substantive mail fraud counts in this

case did not flow from the conspiracy count. The substantively

charged scheme encompassed overcharges for equipment, not

engineering, and, throughout trial, evidence of the two different

overcharges was limited to the appropriate counts. We consider

it disingenuous of the government to abandon this distinction,

which it repeatedly has emphasized, when the blurring of the

schemes conveniently serves a specific argument.

The finding of error does not, however, conclude our

inquiry. We still must determine whether the defect in the

indictment prejudiced Yefsky. Fusaro, 708 F.2d at 23 (citations

omitted). Having reviewed the record and considered the impact

of the error on the jury, we conclude "`with fair assurance,

after pondering all that happened without stripping the erroneous

action from the whole, that the [jurors'] judgment was not

substantially swayed by the error.'" United States v. Burke, 948

F.2d 23, 27 (1st Cir. 1991) (quoting United States v. Mazza, 792

-17-

F.2d 1210, 1216-17 (1st Cir. 1986) (quoting Kotteakos v. United

States, 328 U.S. 750, 765 (1946))).

Although the indictment itself did not warn Yefsky of the

nature of the engineering conspiracy, he received ample notice

before trial of the facts underlying it. Months before trial,

the district court's decision on his motion informed Yefsky that

"it would have been necessary for the defendant to charge

inflated rates in order to make the alleged kickbacks to

defendant Coogan." Memorandum and Order at 2. In addition,

documents provided by the government during discovery revealed

the overcharges that formed a basis for the engineering

conspiracy. Yefsky, moreover, took 24 days to present his

defense, which thoroughly explored his involvement in the BAPERN

project and laid the blame for the engineering fraud at Coogan's

feet. He thus had ample opportunity to rebut the government's

charges. The defect, therefore, was harmless.

IV.

Yefsky also contends that the conspiracy improperly was

joined with the substantive offenses and should have been

severed. Alternatively, Yefsky argues that, because the joint

trial prejudiced him, the district court should have severed the

counts and also should have separated his trial from Coogan's.

We deal first with the question of joinder and second with the

question of severance.

A. Joinder

-18-

Rule 8 of the Federal Rules of Criminal Procedure governs

the joinder of offenses. Offenses may be charged jointly if the

acts or transactions from which they stem are related. Fed. R.

Crim. P. 8(a), (b). Yefsky contends that joinder of the

conspiracy, tax fraud, and mail fraud counts was improper because

each set of offenses was comprised of a discrete series of acts.

The district court determined that despite the distinct nature of

the three offenses, the acts underlying them were sufficiently

connected for the offenses to be joined. Memorandum and Order at

3-5. Our review of joinder is plenary. United States v.

Natanel, 938 F.2d 302, 306-07 (1st Cir. 1991) (citing United

States v. MacDonald & Watson Waste Oil Co., 933 F.2d 35, 59 (1st

Cir. 1991)).

Yefsky points out the following dissimilarities among the

counts. The engineering conspiracy involved one scheme to pay

kickbacks to Coogan and to help him evade tax liability; the tax

fraud encompassed Coogan alone; and the substantive fraud scheme

entailed a distinct plot to inflate equipment prices, which

overcharge Coogan alone pocketed. The conspiracy also predated

the equipment overcharge scheme by three years. Yefsky argues

that the only common thread in these charges is Coogan and that

this single strand is too weak to bind the three offenses.

There can be no doubt that the tax fraud counts properly

were joined with either the conspiracy or the mail fraud counts.

As the district court noted, it is axiomatic that a defendant can

be charged with both the conspiracy and the substantive offenses

-19-

arising from it. United States v. Boylan, 898 F.2d 230, 245 (1st

Cir. 1990); United States v. Arruda, 715 F.2d 671, 678 (1st Cir.

1983). In this case, the conspiracy embraced many of the acts

that constituted the tax fraud offenses and, therefore, the two

properly were joined under Rule 8(b). Similarly, the tax fraud

and mail fraud counts could be joined because some of the

unreported income was the fruit of the mail fraud scheme. See

United States v. Treadwell, 566 F. Supp. 80, 86-87 (D.D.C. 1983),

aff'd, 760 F.2d 327 (D.C. Cir. 1985).

The harder question is whether the conspiracy and the mail

fraud counts properly were joined. Although Count 1 accused

defendants of conspiring to commit mail fraud, this engineering

conspiracy differed from the equipment scheme charged

substantively in Counts 5-14. To determine if the two schemes

sufficiently were connected to the same series of acts to be

joined, we must consider whether there is "substantial identity

of facts or participants" underlying the charged offenses.

United States v. Levine, 546 F.2d 658, 662 (5th Cir. 1977). Mere

similarity of the acts would not suffice. Natanel, 938 F.2d at

307; King v. United States, 355 F.2d 700, 703 (1st Cir. 1966).

We conclude that the indictment properly consolidated these

counts. Both schemes used the same basic mechanism to overcharge

for services and equipment. As the district court found, the

engineering conspiracy and the equipment fraud shared the same

participants and victims and overlapped in time. Both offenses

depended on the interrelationships among the GBPC, Coogan, and

-20-

Yefsky for their operation. A joint trial of the offenses thus

avoided problems of inconsistent verdicts and repetition of

testimony. See United States v. Doherty, 867 F.2d 47, 63 (1st

Cir. 1989). Accordingly, the acts underlying the offenses were

sufficiently related to warrant joinder.

A finding of proper joinder does not, however, end our

inquiry. If a defendant is prejudiced from the joinder of

counts, severance may be appropriate, pursuant to Fed. R. Crim.

P. 14.5 We, therefore, must consider whether the benefit of

joinder outweighed the risk of prejudice to the defendant. King,

355 F.2d at 704.

B. Severance

Yefsky argues that the district court erred in refusing to

sever the engineering conspiracy from the equipment fraud6 and

his trial from Coogan's. The decision to grant severance is

committed to the district court's sound discretion. Zafiro v.

United States, 61 U.S.L.W. 4147, 4148-49 (U.S. Jan. 26, 1993);

Natanel, 938 F.2d at 308. Severance is appropriate "only if

5 Rule 14 provides in relevant part:

If it appears that a defendant or the government is
prejudiced by a joinder of offenses or of defendants in
an indictment or information or by such joinder for
trial together, the court may order an election or
separate trials of counts, grant a severance of
defendants or provide whatever other relief justice
requires.

6 We do not address the question of severing Counts 2-4.
Because Coogan was the only defendant charged with tax fraud and
he has not appealed, these offenses will not be re-tried and
cannot affect Yefsky on a remand.

-21-

there is a serious risk that a joint trial would compromise a

specific trial right of one of the defendants, or prevent the

jury from making a reliable judgment about guilt or innocence."

Zafiro, 61 U.S.L.W. at 4148. Incidental spillover prejudice,

which is almost inevitable in a multi-defendant trial, does not

suffice. United States v. Sabatino, 943 F.2d 94, 97 (1st Cir.

1991); United States v. Martinez, 922 F.2d 914, 923 (1st Cir.

1991). We will not reverse a denial of severance, therefore,

unless the defendant makes "`a strong showing of prejudice.'"

United States v. Gray, 958 F.2d 9, 14 (1st Cir. 1992) (quoting

United States v. Font-Ramirez, 944 F.2d 42, 45 (1st Cir. 1991)).

We look first at the severance of counts. In his pre-trial

motion to sever, Yefsky suggested only that evidence of the

amount of money garnered from the equipment fraud would overwhelm

the lack of evidence of his participation in the engineering

scheme. The district court refused to sever the counts, finding

the mere allegation of potential spillover insufficient to

warrant severance. Memorandum and Order at 6.

We agree with the district court. It was Yefsky's burden to

articulate specific ways in which he was prejudiced. Zafiro, 61

U.S.L.W. at 4149. To make the requisite strong showing of

prejudice, a defendant must "present enough information . . . to

satisfy the court that the claim of prejudice is genuine."

United States v. Tracy, No. 92-1459, slip op. at 9 (1st Cir.

March 29, 1993) (quoting Baker v. United States, 401 F.2d 958,

977 (D.C. Cir. 1968)). Speculative allegations of prejudice fall

-22-

far short of the prejudice required to prove an abuse of

discretion in denying a motion for severance. United States v.

Porter, 764 F.2d 1, 13 (1st Cir. 1985) (citations omitted).

Yefsky did not provide the district court with a factual basis to

determine if his claim of prejudice was genuine. On this record,

the court did not err in denying the motion to sever counts.7

Yefsky also contends that he was prejudiced by being tried

with Coogan. Specifically, Yefsky argues that the weight of the

evidence against Coogan, coupled with the lack of specific

instructions at the close of trial limiting that evidence to

Coogan, prevented him from presenting adequately his defense that

he was merely a pawn in Coogan's scheme.

This argument first ignores the fact that Yefsky was charged

with Coogan in a conspiracy and in a separate mail fraud scheme.

Evidence against Coogan thus was admissible against Yefsky.8

7 On appeal, Yefsky suggests for the first time that he was
prejudiced by the jury's inability to differentiate between the
engineering conspiracy and the equipment scheme. He bases his
argument on the fact that the four substantive counts of which he
was convicted involved projects for which he personally performed
engineering work. Because this argument was not presented to the
district court, even though Yefsky raised the issue of severance
again in his post-judgment motion for a new trial, we do not
consider it on appeal. Tracy, slip op. at 9 n.2 (citing United

States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990)).

8 Toward the close of trial, the district court determined
that a preponderance of the evidence demonstrated the existence
of a conspiracy, each defendant's membership in it at the time
that certain declarations were made, and that these declarations
were made in furtherance of the conspiracy. It therefore allowed
the issue of conspiracy to go to the jury. See United States v.

Petrozziello, 548 F.2d 20, 23 (1st Cir. 1977). The court later

charged the jury that it could consider each co-conspirator's
acts and statements in determining a defendant's participation in
the conspiracy. Yefsky did not challenge this instruction.

-23-

Sabatino, 943 F.2d at 96; see Wormick, 709 F.2d at 461 (applying

conspiracy doctrines to multi-member mail fraud schemes). A

separate trial, therefore, would not have availed Yefsky.

Second, the argument overlooks the fact that mere antagonism

of defenses does not require severance. Zafiro, 61 U.S.L.W. at

4148; Arruda, 715 F.2d at 679 (citations omitted). Instead, the

tension between defenses must be so great that a jury would have

to believe one defendant at the expense of the other. Arruda,

715 F.2d at 679. Yefsky has not met this standard. Although

Yefsky proclaimed his innocence by blaming Coogan, Coogan merely

denied the occurrence of any fraud. Yefsky cannot credibly

complain that a jury believing Coogan's defense therefore would

find Yefsky guilty.

The district court, in fact, took appropriate steps to

minimize any spillover prejudice Yefsky might suffer. It

routinely issued instructions limiting the evidence to the

appropriate counts and defendants. Juries are presumed to follow

such instructions. Richardson v. Marsh, 481 U.S. 200, 211

(1987). It also instructed the jury to give separate

consideration to an individual defendant's guilt on each count.

These instructions were sufficient to cure incidental prejudice

from evidentiary spillover. See Zafiro, 61 U.S.L.W. at 4149.

Rule 14 leaves the determination of the risk of prejudice

and any necessary remedy to the court's discretion. The district

court weighed the risk to Yefsky and acted suitably to protect

him. Because Yefsky has not shown any manifest prejudice, the

-24-

district court did not abuse its discretion in denying his motion

to sever.

V.

Yefsky next argues that the district court erred in

excluding defense evidence offered at trial and that the errors

prevented him from presenting his defense. We review each piece

of evidence in turn.

A. Maxine Yefsky

Maxine Yefsky acted as bookkeeper for her husband's and

son's firms. She testified that she had no accounting training

and had problems filing correct Forms 1099 with the IRS. The

district court barred her from testifying about a conversation

she had had with Coogan in January 1981 about these forms. Ms.

Yefsky would have testified that Coogan had told her not to file

the forms for him because his office would. The court excluded

Coogan's statement as hearsay.

Yefsky contends that the court erred in excluding Coogan's

statement as hearsay. Yefsky urges that the evidence was not

hearsay because he sought to introduce it only to demonstrate his

wife's reliance on the statement and his own lack of intent to

help Coogan evade taxes. See United States v. Hicks, 848 F.2d 1,

3 (1st Cir. 1988) (evidence not offered for its truth is not

hearsay). The government agrees on appeal that the testimony

wrongly was excluded.

We must consider, however, whether the error harmed Yefsky.

Lubanski v. Coleco Indus., Inc., 929 F.2d 42, 47 (1st Cir. 1991).

-25-

Our inquiry depends on the centrality of the evidence excluded

and the prejudicial effect of the exclusion. Id. at 46

(citations omitted). Yefsky argues that the error was highly

prejudicial because it effectively prevented him from presenting

a defense to the tax fraud conspiracy. His defense was that he

had no knowledge of and no intent to assist Coogan's wrongdoing

but was merely a pawn.

Our review of the record convinces us that the error was

harmless. This evidence was relevant only to the tax fraud

objective of the conspiracy count. As we have found sufficient

evidence of Yefsky's participation in the engineering fraud

objective, see Section II supra, the erroneous exclusion of Ms.

Yefsky's testimony did not affect Yefsky's conviction on Count

1.9

B. Motorola

Two Motorola employees called by Coogan testified about

their involvement with the BAPERN project. Both testified that

they had made sales proposals to prospective customers and had

had conversations with their supervisors regarding GBPC pricing

procedures and policies. One employee also testified that he

knew of equipment prices quoted by Coogan. The court prohibited

as hearsay testimony about the substance of the witnesses'

9 Moreover, on cross-examination, Yefsky testified that his
wife had informed him of her conversation with Coogan. He also
testified that, in not filing the tax forms, she had relied on
Coogan's assurance that he would. His trial counsel used this
testimony in closing argument to support Yefsky's defense.
Yefsky himself thus cured the error, and he cannot complain now
of prejudice.

-26-

conversations with their supervisors and their customers, which

would have revealed Motorola's awareness of Coogan's pricing

practice.

At trial, Yefsky attempted to use this testimony to show

that Motorola had offered BAPERN prices to non-GBPC members. On

appeal, Yefsky argues instead that the testimony was admissible

to demonstrate his lack of knowledge that Coogan was inflating

prices. The government again concedes that the disputed

testimony would not be hearsay if offered for the purpose Yefsky

now advances. But because Yefsky raises this issue for the first

time on appeal, we review the exclusion for plain error. United

States v. Young, 470 U.S. 1, 15 (1985). Yefsky can prevail only

if the error was so egregious that he suffered a miscarriage of

justice. Id.

Yefsky does not meet this standard. Although the employees

did not testify about the actual price discrepancies, they did

state that they did not discuss the discrepancies with the GBPC

chairman. Yefsky thus was able to argue that Motorola tolerated

the inflated prices. Yefsky also called a third Motorola

employee who testified that Yefsky had consulted Motorola before

making three price proposals and that those prices matched

Motorola's. Yefsky thus could argue that he did not assist

Coogan to inflate equipment prices, or at least acted in good

faith when he quoted prices, and that Motorola did not inform him

of Coogan's overcharging. Under these circumstances, Yefsky had

-27-

adequate fuel for his defense and did not suffer from the

exclusion of the testimony in question.

Yefsky also claims that the district court erroneously

excluded the depositions of two police chiefs, which also would

have shown Motorola's knowledge of Coogan's pricing practice.

Deposition testimony is admissible, however, only when the

witness is unavailable. Fed. R. Evid. 804(b)(1). One of the

witnesses actually testified at trial for the government and, so,

clearly was available. Yefsky has offered no evidence that the

other witness was unavailable. No error, therefore, occurred.

C. Harvard Radio Tower Project

A Harvard official testified about Harvard's entry to the

BAPERN system. Yefsky then tried to elicit evidence of work he

subsequently performed on the Harvard radio tower. The district

court excluded the evidence as irrelevant. Yefsky argues that

the testimony was admissible as evidence of his good faith as a

general business practice.

A district court enjoys broad discretion regarding the

admissibility of evidence on relevancy grounds. Conway v.

Electro Switch Corp., 825 F.2d 593, 597 (1st Cir. 1987). We will

reverse a court's decision only upon a showing of manifest abuse

of discretion. Id. (citations omitted).

Yefsky does not make such a showing. At trial and on

appeal, Yefsky concedes that his work on the Harvard radio tower

project was not connected to any GBPC or BAPERN contract. Nor

was it temporally related to BAPERN, for the project came two

-28-

years after he completed work on Harvard's entry to BAPERN.

Accordingly, the district court did not abuse its discretion in

refusing to admit testimony so tenuously connected to the issues

at hand.10

VI.

Finally, we turn briefly to the issues remaining in Yefsky's

appeal.

A. Double Jeopardy

Yefsky also raises the severance of counts issue as a

problem of double jeopardy. He claims that evidence of the

engineering conspiracy impermissibly was used to convict him of

the equipment mail fraud and therefore caused him to be tried

twice for the engineering conspiracy. This claim is mistaken.

Yefsky properly could be charged with conspiracy to commit mail

fraud and with the underlying substantive mail fraud. Boylan,

898 F.2d at 245. Such an indictment would not have exposed

Yefsky to double jeopardy because the government would have had

to prove different facts for each charge. See Serino, 835 F.2d

at 930. In an indictment for both conspiracy and mail fraud, the

first requires proof of an agreement and an intent to involve the

mails, and the second requires proof that the mails were used.

Dray, 901 F.2d at 1137; United States v. Camiel, 689 F.2d 31, 36

(3d Cir. 1982). The problem Yefsky raises is that the jury may

10 In any event, we note that the court allowed Yefsky
ample time to delve into his work on specific BAPERN projects.
He thus was able to use BAPERN work to prove his defense of good
faith.

-29-

have been unable to compartmentalize the evidence properly. See

Section IV supra.

B. Jury Charge

Yefsky also contends that the district court erred in not

charging the jury that specific intent to commit the object

offenses was an essential element of the conspiracy. The court

instructed the jury that "[w]hat is necessary is that the

defendant must have knowingly and willfully participated in some

way in the unlawful plan with the intent to further the unlawful

purpose of the conspiracy." Tr. Vol. 82 at 20. We review the

jury charge as a whole to determine whether this instruction was

erroneous. Cupp v. Naughten, 414 U.S. 141, 146-47 (1973).

Although the insertion of "specific" before "intent" may be

preferable, we find the jury charge sufficient. We upheld a

similar instruction in United States v. Porter, 764 F.2d 1, 16-17

(1st Cir. 1985), which stated, "you would have to find that the

person knew that a conspiracy existed and voluntarily entered

into it with the intent of achieving the illegal object of the

agreement". Here, the court defined the terms "knowingly" and

"willfully" for the jury before giving the disputed instruction.

In particular, it defined "willfully" to mean "voluntarily and

purposefully with the specific intent to do something the law

forbids." Tr. Vol. 82 at 15. The court thus clearly instructed

the jury that it had to find that Yefsky joined the conspiracy

with the specific intent to accomplish the unlawful purpose of

the conspiracy, namely tax and mail fraud. Because the

-30-

instruction adequately covered specific intent, Yefsky is not

entitled to any relief. United States v. McGill, 953 F.2d 10,

12-13 (1st Cir. 1992); United States v. Nivica, 887 F.2d 1110,

1124 (1st Cir. 1989).

Affirmed.

-31-